IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANE LUDWIN, | ) |
|       Plaintiff, | ) |
| v. | ) No. 09 C 4954 |
| | ) Magistrate Judge Michael T. Mason |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security,[1] | ) |
|       Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Jane Ludwin ("claimant" or "Ludwin") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Respondent Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"). This matter is before the Court on cross motions for summary judgment [18, 23]. Claimant seeks reversal of the Commissioner's decision denying her application for disability insurance benefits ("DIB"). Alternatively, claimant seeks a remand of the case for a rehearing. The Commissioner seeks an order upholding the decision to deny benefits. For the reasons set forth below, claimant's motion for summary judgment [18] is granted in so far as she seeks a remand. The Commissioner's motion [23] is denied.

**I.     BACKGROUND**

    **A.     Procedural History**

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure ("Rule") 25(d)(1), Carolyn W. Colvin is automatically substituted as the Defendant in this suit. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Claimant filed an application for DIB on January 25, 2006, alleging a disability onset date of January 18, 1997, due to severe pain associated with osteoarthritis, GERD, recurrent kidney stones, and constipation; as well as depression and anxiety. (R. 114.) Claimant's date last insured ("DLI") was March 31, 2005.[2] The Social Security Administration ("SSA") denied her initial application on August 3, 2006, and then upon reconsideration on October 4, 2006. (R. 10.) Claimant filed a timely request for a hearing on November 13, 2006. (*Id.*) The Administrative Law Judge ("ALJ") held a hearing on December 16, 2008, at which claimant and Vocational Expert ("VE") James Breen testified. (R. 21.)

On February 11, 2009, the ALJ issued a decision denying the claim for benefits. (R. 17.) Claimant filed a timely request to review the ALJ's decision, and the Appeals Council denied review on June 12, 2009, making the ALJ's decision the final decision of the Commissioner. (R. 1-3.) Claimant subsequently filed this appeal pursuant to 42 U.S.C. § 405(g). The parties consented to this Court's jurisdiction [10] pursuant to 28 U.S.C. § 636(c).

B. **Medical Evidence**

1. **Treating Physicians' Opinions**

a. **Dr. Laura Saelinger-Shafer, General Internist**

Claimant began treatment with Dr. Laura Saelinger-Shafer ("Dr. Saelinger-Shafer"), a general internist, in 2000. (R. 849.) Dr. Saelinger-Shafer drafted a letter

---

[2] Because Social Security disability benefits under Title II equal insurance against lost income caused by disability, the applicant/worker must show a recent connection to the work force to maintain insured status. 42 U.S.C. § 423(c) and 20 C.F.R. § 404.130. This generally means the applicant was working in twenty of the last forty quarters. For an applicant who is thirty-one years old or older, the "last date of insured status" is generally five years after her date of last work.

dated June 16, 2007, addressing claimant's functional abilities. (*Id.*) Based on her seven years of treating Ludwin, Dr. Saelinger-Shafer opined that Ludwin had multiple medical conditions that contribute to her inability to work, and that these medical conditions rendered her unable to work prior to her DLI. (*Id.*) In support of these conclusions, Dr. Saelinger-Shafer cited to claimant's severe osteoarthritis. (*Id.*) Claimant had undergone two cervical laminectomies to relieve severe, unrelenting neck pain in October 2002 and January 2004. (*Id.*) Claimant also suffered from cervical disease. (*Id.*) She cannot raise her arms without severe pain and is limited to lifting no more than five pounds. (*Id.*)

Dr. Saelinger-Shafer also cited to claimant's severe GERD, which required a Nissan fundoplication. (R. 849.) That surgery is reserved for the most severe cases of acid reflux and Ludwin is only her second patient to have undergone that surgery. (*Id.*) The procedure involves wrapping the top part of the stomach around the lower part of the esophagus. (*Id.*) Because of the severe GERD, claimant cannot bend over. (*Id.*) If claimant does, the acid contents in her stomach will come into her mouth. (*Id.*) Claimant also suffers from severe constipation, and had a partial colon resection because of severe diverticulitis in April 2003. (*Id.*) Since the colon resection, Ludwin has chronic pain that requires daily medication. (*Id.*) Claimant's chronic kidney stones also cause severe pain, require her to take large doses of narcotics for weeks, and render her unable to function. (*Id.*) Claimant also required stents and two lithotripsies to remove kidney stones. (*Id.*) Finally, Dr. Saelinger-Shafer noted that claimant is on medication to treat her anxiety and depression. (*Id.*)

**b.     Dr. Evelyn Segal, Clinical Psychologist**

Dr. Evelyn Segal ("Dr. Segal"), a licensed clinical psychologist, began treating claimant with individual psychotherapy in January 2006 for her anxiety and depression. (R. 860.) Dr. Segal opined that illness, physical pain, and family and situational stress caused claimant increased anxiety, a depressed mood, decreased concentration, and increased fatigue and hopelessness. (*Id.*) Dr. Segal further opined that claimant's depression and anxiety restricted her daily activities and required rest and a modulation of activities throughout the day. (*Id.*) Claimant's mental health problems also negatively impacted her ability to sustain concentration and attention, resulting in a failure to complete tasks. (R. 861.) Dr. Segal concluded that claimant did not appear capable of sustaining regular employment due to her mental health issues. (*Id.*)

### 2. Medical Records

#### a. Physical Ailments

The treatment notes in the record begin in 2000. In February 2000, claimant went to the gynecologist who had performed a prior hysterectomy because of severe endometriosis, to report severe left breast and shoulder pain over the prior two months. (R. 638.) To reduce the breast pain, claimant was told to stop or reduce the hormones she was taking, but doing so caused a worsening in her migraines. (R. 639.)

In March 2000, claimant attended physical therapy for neck pain. (R. 624-29.) Over the next two years, she reported intermittent neck pain. An August 7, 2002 MRI of her cervical spinal cord indicated a herniated disc at C4-C5 and osteophytes at C5-C6. (R. 420.) An October 2, 2002 MRI indicated a herniated disc and mild cervical stenosis at C4-C5. (R. 532.) That day, claimant underwent an anterior cervical discectomy and neck fusion surgery. (*Id.*) A few weeks after the surgery, claimant still had burning in

her left shoulder, but x-rays showed good spinal alignment. (R. 658.)

In April 2003, claimant had a complicated partial colon resection to treat recurrent diverticulitis. (R. 232, 755.) Prior to that surgery, claimant had bouts of diverticulitis in May 2001, June 2002, and March 2003. (R. 843.) In the months prior to the surgery, claimant repeatedly complained of abdominal pain and had multiple CT scans. (R. 418-19.) A June 2003 CT scan showed an abscess in the pelvis and kidney stones in both kidneys. (R. 755-56.) Claimant reported abdominal pain again in July and September 2003. (R. 316, 318.)

On October 12, 2003, imaging of her cervical spine indicated a loss of normal lordosis with mild kyphosis and mild retrolisthesis of C4 causing mild spinal stenosis. (R. 754.) Claimant also had a disc bulge, narrowing at C3-C4 from osteophytes, and other problems. (*Id.*) A December 19, 2003 CT scan noted a large disc herniation at C5-C6 with moderate to severe central spinal stenosis, borderline cord compression, and compression of the existing left C6 nerve root. (R. 746.) Claimant also had a disc bulge at C3-C4 and a congenitally narrow spinal canal. (*Id.*)

Claimant had a second neck fusion surgery on January 7, 2004. (R. 742.) The surgeon removed claimant's C4-C5 anterior plate and performed a discectomy at C5-C6 and anterior plating, and a fusion of C4 to C6. (R. 583.) After the surgery, claimant reported pain and difficulty swallowing. In June 2004, claimant reported less pain, but worsening burning, especially when raising her arms. (R. 326.) On September 26, 2004, claimant had a scan that confirmed a 5mm calculus stone in the left kidney. (R. 739.) In December 2004, claimant was experiencing left hand and arm numbness. (R. 234.)

In March 2005, claimant reported left hip pain and received a left trochanteric bursa injection. (R. 236.) Claimant had surgery to address a bowel obstruction on April 8, 2005. (R. 548.)

### b. Mental Ailments

In September 2000, claimant reported a decrease in anxiety and insomnia while on Paxil. (R. 267.) On May 14, 2001, while still taking Paxil and Lorazepam, Claimant reported poor sleep and depression. (R. 274-75.) In July of that year, she was immediately referred for a mental health evaluation when she reported the urge to drive into a tree and episodes of palpations and shortness of breath. (R. 278.) A September 2002 treatment note indicated continued use of Paxil and Lorazepam. (R. 295.) In November, claimant reported an increase in anxiety and insomnia, so the doctor increased her Paxil dosage. (R. 296.) Claimant's reports of depression and anxiety, and her use of Paxil and Lorazepam, continued through March 31, 2005, her DLI. (R. 226-441.)

### 3. Agency Consultants

On July 24, 2006, Dr. Robert Patey ("Dr. Patey") completed a physical residual functional capacity ("RFC") assessment for Ludwin. (R. 805-11.) He did not examine or treat claimant. (R. 805) He opined that she could lift and/or carry fifty pounds occasionally, and twenty-five pounds frequently, and could stand and/or walk and sit for six hours out of an eight hour workday. (*Id.*) He also found that she did not have any postural, manipulative, or environmental limitations, or limits on pushing or pulling. (R. 805-08.) In support of these conclusions, he stated that claimant's symptoms seemed magnified by psychiatric issues. (R. 809.)

Dr. Patey noted that he did not have access to treating or examining source statements regarding claimant's physical capacities. (R. 810.) In support of his conclusions, he cited to claimant's history of surgeries on her left shoulder, hand, and elbow, and bilateral hip pain. (R. 811.) He also noted that although her GERD was problematic, there was no evidence of weight loss or anemia related to gastrointestinal problems. (*Id.*) He also considered her occasional abdominal and joint pain, kidney stones, and her neck surgeries in October 2002 and January 2004. (*Id.*)

Dr. Terry Travis ("Dr. Travis") completed a mental RFC assessment for claimant on July 21, 2006. (R. 812-14.) He found that claimant was moderately limited in her ability to maintain attention and concentration for extended periods, but not significantly limited in the other nineteen categories he considered. (*Id.*) He described claimant's depression as moderate with sleep problems. (R. 814.) He also noted slow speech, some concentration problems, and moderate limitations in daily activities. (*Id.*) He found that her memory and judgment were normal and that she should be able to do simple tasks. (*Id.*)

Dr. Harley Rubens ("Dr. Rubens") completed a psychiatric evaluation of Ludwin on June 14, 2006. (R. 771.) He found Ludwin had an adjustment disorder with mixed anxiety and depression; dysthymic disorder; and possible somatization disorder. (*Id.*) Claimant reported numerous surgeries including: a hysterectomy to treat endometriosis; a bowel resection to treat diverticulitis; bowel obstruction surgery in 2005; gallbladder removal in October 2005; multiple lithotripsies to treat kidney stones; surgery to treat her GERD; two left shoulder surgeries; two neck surgeries; three carpal tunnel surgeries; three knee surgeries; and jaw surgery. (R. 771-72.) Dr. Rubens opined that

7

claimant was suffering from a long, lingering depression, which she had begun to feel was her normal state. (R. 774.) Ludwin did not describe major depressive symptoms, psychosis, or demonstrate any cognitive impairments. (R. 775.)

Dr. Thomas Nutter ("Dr. Nutter") evaluated claimant on July 17, 2006. (R. 841.) He found her to have anxiety and major depression. (R. 847.) He recommended that she increase her Paxil dosage and attend individual therapy sessions. (*Id.*)

### C. Claimant's Testimony

Ludwin appeared at the December 16, 2008 hearing and testified as follows. At the time of the hearing, Ludwin was forty-five years old. (R. 23.) She did not graduate high school or complete her GED. (R. 24.) Ludwin worked as a waitress between 1989 and 1997, but left that job because she was missing too much work due to surgeries. (R. 27.) Between August 1998 and June 2000, after her alleged disability onset date, Ludwin worked as a cafeteria attendant in a school lunchroom 2.25 hours a day, five days a week. (R. 25.) Ludwin left that job because she sustained a couple of injuries from lifting buckets of water while cleaning the lunch tables. (R. 26.) Ludwin has not worked since 2000. (*Id.*)

At the time of the hearing, Ludwin was using a cane because of a knee injury in September 2008. (R. 28.) She has carried a cane with her for years to avoid falling. (*Id.*) She was also suffering from major pain in her lower back; herniated discs that are pushing on a nerve; continual kidney stones; neck, shoulder, and tail bone problems; depression; auto-immune disease; issues related to the removal of her spleen; and lupus. (*Id.*) Ludwin cannot sit or stand for very long. (R. 29.) Sometimes she can walk through the grocery store if someone else is doing the shopping. (*Id.*) When she sits,

she is constantly readjusting and moving. (*Id.*) On her doctor's orders, she is only allowed to lift up to five pounds. (*Id.*) She was taking seventeen different medications to treat various ailments. (R. 213.) Ludwin has been hospitalized many times, but not because of her mental state. (R. 31.) She has had over forty surgeries, including two neck surgeries. (*Id.*)

Ludwin's husband and daughter do most of the housework. (R. 32.) She does some light dusting, folds some small laundry items, feeds the animals, makes her bed, and helps her husband cook. (*Id.*) During the day, Ludwin sometimes watches TV and stares out the window. (*Id.*) She occasionally visits a neighbor and, if she is feeling well, spends time making miniature houses. (*Id.*) She is not able to manage her checkbook and suffers from memory and concentration problems. (R. 32, 35)

The day of the hearing, Ludwin woke up with kidney stones. (R. 33.) She gets them two to four times per year and they require medical intervention. (*Id.*) The kidney stones are calcium deposits and because of her chronic acid reflux problems, she cannot use traditional methods to dissolve the stones. (*Id.*) Ludwin's pain is constant and when it is really bad, she stays in bed for days. (*Id.*)

### D.     Vocational Expert's Testimony

VE Breen also offered testimony at the hearing. The VE testified that claimant had not engaged in any substantial gainful activity in the past fifteen years. (R. 36.) Claimant's work as a cafeteria attendant would be considered unskilled, light work. (*Id.*) Her work as a waitress would be considered semi-skilled, light work, but she performed it at a medium level of exertion. (*Id.*)

The ALJ then asked the VE to consider a hypothetical individual of claimant's age

and education, with no work experience, who had an RFC to perform no more than medium work. (R. 37.) The VE testified that there were a wide range of unskilled sedentary, light, and medium occupations. (*Id.*) Examples of those occupations include warehouse worker and janitor. (*Id.*)

If the hypothetical person was limited to light work and was moderately limited in the ability to maintain attention and concentration for extended periods, that would rule out medium exertion level occupations. (R. 38.) But that person would still qualify for a wide range of unskilled, light work. (*Id.*) If the limits on concentration did not take the person off task for more than ten percent of the day, available occupations would include cashier, fast food worker, and cafeteria attendant. (*Id.*) The VE also noted that if the concentration problems caused the worker to take unscheduled breaks, all jobs would be precluded. (*Id.*)

The VE testified that a person with an RFC as described by Dr. Segal would be unemployable. (R. 39.) He also testified that if claimant's testimony was fully credited, she would be limited to less than a sedentary RFC. (*Id.*) According to claimant's testimony, she needed to sit, stand and walk constantly, could only lift five pounds, and had difficulty with memory. (*Id.*) The VE also stated that claimant did not specify how many "bad days" she had, but that if she had more than ten or twelve per year, she would be unemployable. (*Id.*)

## II. LEGAL ANALYSIS

### A. Standard of Review

The Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940

(7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In making this substantial evidence determination, the Court must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). The Court will "conduct a critical review of the evidence" and will not affirm the Commissioner's decision "if it lacks evidentiary support or an adequate discussion of the issues." (*Id.*)

While the ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion," he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At a minimum, the ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

     **B.**    **Analysis Under the Social Security Act**

In order to qualify for DIB, a claimant must be "disabled" under the Act. A person is disabled under the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment…which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant

is disabled, the ALJ must make the following five-step inquiry: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *See* 20 C.F.R. § 404.1520(a); *Dixon,* 270 F.3d at 1176. The claimant has the burden of establishing disability at steps one through four. *Zurawski v. Halter*, 243 F.3d 881, 886 (7th Cir. 2001). At step five, the burden shifts to the Commissioner to show that the claimant is capable of performing work in the national economy. *Id.*

The ALJ followed this five-step process. At step one, the ALJ found that claimant had not engaged in substantial gainful activity after January 18, 1997, the alleged onset date. (R. 13.) At step two, the ALJ concluded that claimant had the following severe impairments: depression, anxiety, fibromyalgia, a history of cervical laminectomies, carpal tunnel syndrome, diverticulitis, acid reflux, endometriosis, renal stones, and hip bursitis. (*Id.*) The ALJ further found that claimaint's mental impairments resulted in mild limitations in her activities of daily living and in her social functioning, and moderate limitations in her concentration, persistence, and pace. (*Id.*)

At step three, the ALJ concluded that, even in combination, claimant's physical and mental impairments did not meet or medically equal the criteria of any listing in the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 13.) The ALJ explained that he found that claimant's impairments did not manifest clinical signs and findings that met the specific criteria of any listings. (*Id.*) He also noted that he

considered the opinions of the agency medical consultants, who he believed reached the same conclusion. (*Id.*)

At step four, the ALJ determined that although claimant did not have any past relevant work experience, as of her DLI, she had the RFC "to perform medium work (i.e. lift up to 50 pounds occasionally and 25 pounds frequently; stand and/or walk and/or sit 6 hours in a normal 8-hour workday), subject to postural limitations against climbing ladders, ropes or scaffolds; more than occasional balancing, kneeling, stooping, crouching, crawling or climbing of ramps and stairs; environmental limitations precluding concentrated exposure to hazards or even moderate exposure to fumes, odors, dusts, gases, poor ventilation etc.; and a moderate limitation in the ability to maintain attention and concentration for extended periods." (R. 13.) The ALJ noted that in making that finding, he considered opinion evidence and claimant's testimony to the extent it was consistent with objective medical evidence. (R. 13-14.)

At step five, the ALJ found that given claimant's age, education, work experience, and RFC which included a medium level of exertion with additional restrictions, claimant could perform a significant number of jobs in the economy including warehouse and janitorial jobs. (R. 16.) Based on this finding, the ALJ concluded that claimant was not disabled under the Act and denied her application for DIB. (R. 17.)

Claimant now argues that the ALJ erred in (1) failing to give controlling weight to the opinions of her treating physicians; (2) failing to properly assess her RFC; and (3) improperly assessing her credibility. We address each issue below.

**C.    The ALJ Improperly Dismissed the Opinion of Claimant's Treating Physician and Psychologist.**

Generally, the ALJ will give the opinion of a treating physician controlling weight because treating physicians are "most able to provide a detailed, longitudinal picture" of the claimant's medical condition. 20 C.F.R. § 404.1527(c)(2). However, "[a] treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'consistent with substantial evidence in the record.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (*quoting* 20 C.F.R. § 404.1527(c)(2)); *see* SSR 96-2p; see 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine what amount of weight to afford the opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (*citing* 20 C.F.R. § 404.1527(c)(2)). The ALJ must always give "good reasons" for his determination as to the amount of weight given. 20 C.F.R. § 404.1527(c)(2).

Here, the sole basis the ALJ gave for discounting Dr. Saelinger-Shafer's opinion that claimant was incapable of performing even unskilled, sedentary work on a sustained basis before her DLI, was that her opinion was not supported by documentary evidence. (R. 15.) This finding by the ALJ constitutes reversible error for at least two reasons. First, contrary to the ALJ's finding, Dr. Saelinger-Shafer's opinion appears to be supported by substantial evidence. As discussed above, in support of her opinion,

14

Dr. Saelinger-Shafer noted that between 2000 and claimant's DLI, she had treated claimant for severe osteoarthritis; two neck surgeries; cervical disease; chronic pain requiring daily medication; GERD; constipation; severe diverticulitis necessitating a partial colon resection; chronic kidney stones; and anxiety and depression. These ailments are also supported by numerous MRIs, CT scans, ultrasounds, surgical notes and other medical evidence in the record. Also, unlike the agency consultant who found claimant capable of lifting fifty pounds occasionally and twenty-five pounds frequently, without citing to any evidentiary support, Dr. Saelinger-Shafer supported her opinion that claimant should lift no more than five pounds by citing to her documented cervical disease and two neck surgeries.

Second, in rejecting Dr. Saelinger-Shafer's opinion, the ALJ did not address any of the § 404.1527 factors. He did not appear to take into account Dr. Saelinger-Shafer's seven year treatment relationship with claimant, the frequency of claimant's examinations, the physician's specialty, the types of tests performed, or the supportability of her opinion. Accordingly, these two errors require remand. *See Moss,* 555 F.3d at 561.

The ALJ also discounted Dr. Segal's opinion that claimant could not sustain work eight hours per day, five days per week. In discounting this opinion, the ALJ found that it was not supported by documentary evidence and noted that Dr. Segal did not begin treating claimant until nine months after her DLI. This finding cannot be affirmed because the ALJ did not cite to any record evidence that was inconsistent with Dr. Segal's findings, and, apart from noting when Dr. Segal began treating claimant, the ALJ did not specifically address the other § 404.1527 factors. *See Moss*, 555 F.3d at

561.

### D. The ALJ Failed to Build an Accurate and Logical Bridge From the Evidence to his Conclusion that Claimant had the RFC to Perform Medium Work.

Next, claimant contends that the ALJ's RFC determination was improper because he failed to properly consider all of the evidence in the record and all of her impairments. Claimant also argues that the ALJ erred in not accepting any of the medical opinions in the record, and instead inserting his own opinion.

A claimant's RFC is the most a claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). In assessing the RFC, the ALJ must consider all of the relevant evidence in the case record, including information about symptoms that might not be shown by objective medical evidence alone. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *5. A court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (*citing Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Id.* at 592.

The ALJ in this case found that, through her DLI, claimant had the RFC "to perform medium work (i.e. lift up to 50 pounds occasionally and 25 pounds frequently; stand and/or walk and/or sit 6 hours in a normal 8-hour work day), subject to postural limitations against climbing ladders, ropes or scaffolds; more than occasional balancing, kneeling, stooping, crouching, crawling or climbing of ramps and stairs; environmental

16

limitations precluding concentrated exposure to hazards or even moderate exposure to fumes, odors, dusts, gases, poor ventilation etc.; and moderate limitation in the ability to maintain attention and concentration for extended periods."

The ALJ's finding that claimant had the RFC to perform medium work is not supported by substantial evidence. First, the ALJ only addressed evidence related to some, but not all of claimant's severe impairments in his decision. The ALJ identified carpal tunnel syndrome and fibromyalgia as severe impairments, but did not address the record evidence related to those impairments. Further, the impairments the ALJ did mention were drastically understated. Specifically, the ALJ missed claimant's first neck surgery, which involved an anterior cervical discectomy and neck fusion on October 2, 2002. In his decision, the ALJ noted an October 28, 2002 shoulder x-ray and then erroneously stated "she apparently underwent surgery between then and November 28, 2002" and never figured out what the surgery was for. The ALJ also mischaracterized claimant's complicated partial colon resection as a "brief hospital stay" related to diverticulitis. The ALJ committed reversible error by failing to address claimant's first neck surgery and mischaracterizing her complicated partial colon resection, two impairments that impact claimant's ability to lift. *See Steele*, 290 F.3d at 941.

The ALJ's statement that he adopted the DDS assessments because they were consistent with the medical and other evidence is also factually inaccurate because the ALJ did not actually adopt a DDS assessment. Dr. Patey found claimant capable of medium work, without any postural, manipulative, or environment limitations, or limits on pushing or pulling. Accordingly, the postural and environmental limitations the ALJ adopted were not based on Dr. Patey's assessment and the ALJ did not specifically

17

articulate any basis in the record for those limitations. That is reversible error because the ALJ "must not substitute [his] own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford*, 227 F.3d at 887.

The ALJ also erred in articulating his reasons for his finding that claimant's severe depression and anxiety only caused a moderate limitation in her ability to maintain attention and concentration for extended periods. This finding adopts Dr. Travis' mental RFC. However, the ALJ did not discuss the opinions of Dr. Segal, Dr. Rubens, or Dr. Nutter. The ALJ also did not engage in a function-by-function assessment of claimant's abilities as required by SSR 96-8p. *See Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

### E. The ALJ's Credibility Determination is Deficient and Warrants Remand.

The ALJ is in the best position to determine the credibility of witnesses, and this Court reviews that determination deferentially. *Craft*, 539 F.3d at 678 (*citing Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)). In other words, the Court will not overturn an ALJ's credibility determination unless it is patently wrong. *Zurawski*, 245 F.3d at 887. To be patently wrong, an ALJ's determination must lack "any explanation or support." *Elder v. Astrue,* 529 F.3d 408, 413-14 (7th Cir. 2008). The ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2. It is well settled that an ALJ "may not reject a claimant's subjective complaints of

pain solely because they are not supported by medical evidence." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Once the ALJ determines that a claimant's impairments could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, or functionally limiting effects" of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2. When statements about such effects are not substantiated by objective medical evidence, the ALJ must make a credibility determination based on the entire case record. *Id.* In making a credibility determination, the ALJ should consider the following factors in addition to objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication the claimant takes to alleviate pain; (5) treatment, other than medication, that the individual has received for relief of pain; (6) any other measures the individual uses to relieve pain; (7) and any other factors concerning the individual's functional limitations. *Id.* at *3.

In this case, the ALJ's credibility determination is patently wrong because it lacks any explanation or support. The credibility determination consists solely of the following boilerplate statement:

> Claimant's testimony of pain, other symptoms and functional limitations, when compared against the objective evidence and evaluated using the factors in SSR 96-7p, was not credible in view of especially the objective findings in the documentary record and her activities.

Unfortunately, the ALJ did not actually cite to any specific objective findings, record evidence, or activities to support this conclusion. He also did not mention any of the

19

specific factors outlined in SSR 96-7p, including any potential side effects from the seventeen medications claimant was taking. See *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). On remand, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

### III. CONCLUSION

For the foregoing reasons, claimant's motion for summary judgment is granted in part and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

**ENTERED:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: June 10, 2013**